ELSEBETH JEPSON, Respondent, v. SHAW TRANS-
FER COMPANY, Appellant.

In the Kansas City Court of Appeals, June 12, 1922.

1. **NEGLIGENCE: Demurrer: Upon Demurrer to Evidence Question of Defendant's Negligence, Held for Jury.** In an action to recover damages for injury to passenger in automcbile struck by taxicab, upon demurrer, evidence *held* sufficient to submit question of defendant's negligence to jury.

2. ————: **Speed: Proximate Cause: Where Excessive Speed was Proximate Cause of Collision it was Immaterial How Accident Happened.** In an action for damages from personal injuries caused by a collision of automobiles, where the excessive speed of one of the automobiles was the proximate cause of the collision, it was immaterial how the accident happened.

3. ————: **Imputable Negligence: Negligence of Husband in Driving an Automobile, Held not Imputable to Wife.** Where plaintiff riding as a passenger in an automobile was injured in a collision between a taxicab and the automobile, the negligence of the driver

of the automobile, her husband, could not be imputed to her where she had no ground to suspect any incompetency or to anticipate any negligence on the part of driver.

4. INSTRUCTIONS: Where Evidence Showed That Negligent Speed. as Submitted to Jury in Instruction was Proximate Cause of Injury, and Jury so Found, Charge Therein as to Plaintiff's Contributory Negligence, not Erroneous. An instruction that, if taxicab entered intersection on wrong side of street and as taxicab approached point of collision it was running at a negligent speed, causing it to collide with an automobile, injuring a passenger therein, the jury should find for the plaintiff, unless she was negligent, was not erroneous, in view of the evidence that the speed of taxicab as submitted to the jury was the proximate cause of the injury.

5. ————: An Instruction That Jury Could not Find for Plaintiff on Ground That Taxicab was Driven on Wrong Side of Street was Properly Refused and Plaintiff in Submitting Such Question in Her Instructions Assumed an Unnecessary Burden. An instruction which told the jury that if they believed the taxicab was being driven upon the wrong side of the street, they could not find for plaintiff on account of such fact, was properly refused, the plaintiff in her instructions having assumed an unnecessary burden in having jury find that the taxicab was being driven upon the wrong side of the street.

6. ————: Words and Phrases: Failure to Define Word ''Imputed'' Used in an Instruction, Held not Error. An instruction in which the word "imputed" was used without definition, the common meaning thereof being to attribute on account of another, held that jury by use in the instruction of the word complained of could not have been misled.

7. ————: Instructions Amended by Court Held not to Broaden Issues nor Erroneous as Attempting to Direct a Verdict. In an action for damages caused by collision of automobiles instructions amended by court by inserting at the end of each one the phrase, "provided you find that defendant's driver was in the exercise of ordinary care at the time and under the circumstances in evidence," held not to broaden the issues nor erroneous as attempting to direct a verdict.

8. EVIDENCE: Physician's Testimony as to Symptoms and Description of Appearance of Woman's Injured Parts, Held not Testimony as to a Condition or Disease. In an action by a woman to recover damages for personal injuries as the result of a collision between a taxicab and an automobile in which she was riding where in-

jury to internal and genital organs, causing a general dropping down and displacement thereof, was pleaded as injury, the testimony of a physician that he examined plaintiff and found the mucous membrane white and painful and uterus hard, was merely a description of the appearance of plaintiff, and testimony as to a symptom or evidence of the displacement and dropping down of the uterus and not testimony as to a condition or disease.

9. ———: Appeal and Error: Objections not Made at Time Evidence was Given Cannot be Made on Appeal. Where objections to evidence were not made at the time the evidence was given, the objctions thereto cannot be made on appeal.

10. ———: Conclusion: Evidence of Driver of Taxicab That He Had Right of Way at Time of Collision, Held Properly Excluded as a Conclusion. Evidence of driver of taxicab, who ran into an automobile injuring a passenger therein, that he had the right of way, was properly excluded as being his conclusion and one that even if properly expressed, under the circumstances, had no bearing upon the situation.

11. ———: Impeachment: Unsuccessful Attempt by Plaintiff to Impeach a Witness, Held not Prejudicial to Defendant. In an action for damages for personal injuries caused by collision of automobiles, the plaintiff's unsuccessful attempt to impeach a witness could not have been prejudicial to defendant.

12. JURY: Qualifications: Challenge: Where Juror Testified to a Controversy Which He Had with Officer of Defendant, But Stated it Would not Influence or Affect Him in Deciding the Case, Held not Ground for Challenge. The court did not err nor abuse its discretion in refusing to sustain defendant's challenge to a juror, who upon his *voir dire*, testified to a controversy which he had with one of the officers of defendant, but stated he had no feeling in regard to the matter and it would not affect him in any manner in deciding the case and that he could try the case and base his verdict solely upon the evidence and the law.

13. DAMAGES: Excessive Verdict: Verdict for $7400 for Fracture of Collar Bone, Injury to Back and Arm, Prolapsus of Uterus Requiring Major Operation to Remedy and Nervousness, was not Excessive. Where plaintiff, as a result of a collision between automobiles, sustained fracture of collar bone, injury to back and arm, causing permanent limitation of movement, suffered from nervousness and a prolapsus of the uterus requiring a major operation to remedy, a verdict for $7400, *held* not excessive.

Appeal from the Circuit Court of Jackson County.—
*Hon. Allen C. Southern,* Judge.

AFFIRMED.

*T. J. Madden, Harry R. Freeman* and *W. H. Senner*
for respondent.

*Guthrie, Conrad & Durham* and *Hale Houts* for appellant.

BLAND, J.—This is an action for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $7400 and defendant has appealed.

The facts show that on November 27, 1919, plaintiff, a woman thirty-nine years of age, was riding with her husband and others in a Ford automobile, going in a southwesterly direction on Southwest Boulevard near its intersection with Broadway, both being public streets in Kansas City, Missouri. When the Ford car reached Broadway it was run into by a taxicab owned by the defendant, resulting in serious injury to plaintiff. The petition charges negligence against the defendant in that (1) the taxicab was being driven on the wrong side of Broadway in violation of the ordinance; (2) that the taxicab was being operated at a high and dangerous rate of speed; (3) failure to give warning of the approach of the taxicab; (4) failure to avoid striking the Ford car by using the means that the taxicab driver had at his command to stop his car or slacken the speed thereof, or to give a signal or swerve the taxicab aside after the driver thereof saw or could have seen that a collision was imminent, and that plaintiff was oblivious to the danger "or in helpless peril thereof."

Defendant complains that the court erred in refusing to give its instruction in the nature of a demurrer to the evidence. The facts taken in their most favorable light to plaintiff show that plaintiff was a member of

a party of four, composed of her husband, her father-in-law, her mother-in-law and herself. The party was touring through Kansas City on their way to California and the expense of the trip was shared by the two men. The car belonged to plaintiff's husband. Plaintiff was seated in the rear seat of the Ford car with her mother-in-law. Her husband and his father were in the front seat. It had been raining the night before and the streets were slick. The curtains were up on the Ford car but there were windows to permit the occupants to see out. They were taking along baggage and a tent, including a tent pole about ten feet long, all of which were being carried on the left running board and left fenders of the car. The tent pole was attached to the outside of the left fender, the front end of the pole being even with the front end of the left fender but the rear end being lower than the front.

Broadway runs north and south and Southwest boulevard in a southwesterly and northeasterly direction. There were double street car tracks on both streets located in the center of the street. The Ford car was being driven to the north of the car tracks on Southwest boulevard or on the north side or right hand side of the street. When it approached Broadway it was going at the rate of ten miles per hour. When the Ford car was in Broadway, forty feet from the point of collision, the taxicab was 100 feet south, coming north and approaching the intersection on the left or wrong side of the street, astride the west rail of the car tracks on Broadway, going at the rate of from 20 to 30 miles per hour. Defendant insists that this distance traversed by the taxicab before the collision, was 75 feet but the evidence is conflicting as to this. The persons in the front seat of the Ford car discovered the presence of the taxicab at that time and the Ford driver put on his brakes and as quick as he saw that there was no chance of avoiding the collision by the means at hand he swerved the car around toward the north and the collision occurred near the northwest curb

of the two streets. At that time the Ford car was travel-
ing three or four miles an hour.

When the taxicab driver saw that a collision was
imminent he also swerved his car toward his left, re-
sulting in the cars coming together at an angle. As to
which car struck the other, there is a dispute in the evi-
dence, but as will be hereinafter pointed out we do not
think it material as to which car ran into the other.
Plaintiff's testimony tends to show that the taxicab hit
the left front wheel of the Ford car, causing the car to
swerve around in the opposite direction and to turn over
on its left side, throwing plaintiff out of the car to her
serious injury. The taxicab proceeded on to the left
of the Ford for 25 or 30 feet where it stopped at approxi-
mately the west curb of Broadway, with its front likewise
turned around in the opposite direction from which it
was going. The taxicab did not slacken its speed at all
prior to the collision. The impact broke off three feet
of the front end of the tent pole and bent the left front
fender of the Ford. The top and one of the left hind
wheels of the Ford were smashed; the wind shield was
gone but the front lights, bumpers and radiator of the
Ford car were not damaged.

It is insisted in connection with the point that de-
fendant's demurrer to the evidence should have been
sustained, that the speed of the taxicab was not shown
to have been the proximate cause of the injury. The
evidence shows that the maximum rate of speed per-
mitted by ordinance at this intersection was 10 miles
per hour. It is conceded that if either car reached the
intersection first, it had the right of way over the other.
Plaintiff's evidence tends to show that the Ford car
reached the intersection before the taxicab. As before
stated, plaintiff's evidence shows that the taxicab ran
100 feet immediately prior to the collision at the rate of
20 to 30 miles per hour. If it ran at the lower rate it
covered this space in 3-9/22 seconds. Had it been going
at the maximu mlawful rate of speed, or 10 miles per

hour, it would have covered the same distance in 6-9/11 seconds. At the time the occupants of the Ford car discovered the presence of the taxicab, the Ford was 40 feet from the point of collision and the taxicab 100 feet. The driver of the Ford car was proceeding at the rate of 14-2/3 feet per second. In 6-9/11 seconds, the time that it would have required the taxicab to cover the 100 feet had it been going at the maximum lawful rate of speed, the Ford car would have gone 100 feet. It is apparent that the excessive rate of speed at which the taxicab was going was a proximate cause of the injury, for the Ford car, no doubt, would have passed in front of the taxicab had the taxicab been proceeding at the maximum rate of speed allowed by the ordinance.

It is insisted that the evidence of plaintiff's witness that the front wheel of the Ford was struck by the front of the taxicab was contrary to physical facts; that it was undisputed that there was no injury to the front part of the taxicab, the only injury being on its side, just in front of the front door, where a hole had been punched through the panel, presumably by the tent pole, and where the battery box had ben smashed. In this connection it is pointed out that plaintiff testified that the taxicab was in front of the Ford when she first saw it. From the record we do not believe that it can be said that the evidence is undisputed as to the damage done to the taxicab. Two of plaintiff's witnesses who saw the collision testified that they noticed no damage to it. Some of plaintiff's witnesses testified that it was damaged on the side.

However, the evidence is not such that, even conceding that the taxicab was damaged on the side, in the place claimed by defendant, we would be justified in saying that the contention that the taxicab struck the Ford at the latter's left front wheel is against the physical facts as established by the injury to the taxicab. The two vehicles came together in a very peculiar manner. The testimony being that they struck "sideways."

It would seem evident that if the taxicab had a hole in it, it was caused by the tent pole. There is no evidence as to how far the tent pole extended outward from the front wheel of the Ford car, nor the distance that the hole in the taxicab was from the portion that struck the front wheel of the Ford. As to plaintiff's testimony in regard to the taxicab being in front of the Ford, she stated, "It seems like it was in front but I cannot say exactly." "I can't say exactly." She testified that she saw the taxicab when the Ford car swerved; that the collision happened almost instantly at the time of the swerving of the Ford car. However, under the facts in this case it is immaterial as to whether the Ford car ran into the taxicab or the taxicab into the Ford, or that the two ran into each other. [Dauber v. Josephon, 237 S. W. 149.] The excessive speed of the taxicab was a proximate cause of the collision.

It is insisted that the doctrine of joint journey applies in this case and that the negligence of the driver of the Ford car should be imputed to plaintiff. Plaintiff had no ground to suspect any incompetency or to anticipate any negligence on the part of her husband, the driver of the Ford who the evidence shows was an experienced one. Whether or not there was any negligence on the part of the driver of the Ford, it is apparent that the doctrine has no application in this case. [Ziegler v. United Rys. Co., 220 S. W. 1016; Burton v. Ryor, 198 S. W. 1117; Davis v. City Light & Traction Co., 204 Mo. App. 174; Corn v. K. C., C. C. & St. Jo. Ry. Co., 228 S. W. 78.] In the last case at l. c. 82, the case of Tannehill v. Railroad, 279 Mo. 158, cited by the defendant, was discussed and distinguished from the facts in the Corn case which are similar to the ones in the case at bar.

Complaint is made of plaintiff's instructions Nos. 1 and 2, which read as follows:

"P-1. The court instructs the jury that if you believe and find from the evidence that the driver of the

taxicab was driving the same on the left side, that is, the west side of Broadway, as he entered the intersection of that street with the Southwest Boulevard and as he approached the point of collision and if you further believe and find from the evidence that as he entered said intersection and approached the point of collision that he was running the taxicab twenty (20) miles or more per hour and if you further believe and find from the evidence that such rate of speed was negligent, under all the facts and circumstances which you find to be shown in evidence, and that as a direct result of said negligence (if any) said taxicab collided with the Ford car in which plaintiff was riding and that plaintiff was thereby injured then your verdict should be in favor of the plaintiff unless you further believe and find from the evidence that she, too, was negligent and that such negligence (if any) on her part contributed to said collision.''

"P-2. The court instructs the jury that even though you find that the driver of the Ford car in which plaintiff was riding was negligent yet such negligence (if any) on his part cannot be imputed to the plaintiff in this case, and if you believe and find from the evidence that the defendant Shaw Tranfer Company was negligent, as defined in these instructions, and that plaintiff's injuries (if any), were the direct result of the negligence (if any) on the part of the driver of the taxicab then the defendant cannot be relieved of liability merely because the driver of the Ford may have been negligent and even though the negligence (if any) of the driver of the Ford car concurred with the negligence (if any) of the driver of the taxicab in causing the injury.''

It is insisted that instruction No. 1 is erroneous because it ''authorized the jury to find either that a speed of 20 miles per hour and no more was the cause of the collision or that a speed in excess of 20 miles an hour was the cause of the collision,'' that ''under the instruction any speed less than 20 miles an hour was authorized.'' ''Under the first hypothesis the jury was au-

thorized to find that a rate of speed of 20 miles per hour and no more was negligent, whereas a speed of a fraction less than 20 miles per hour was not negligent and authorized it to find that this fractional difference in the rate of speed, to-wit, "the difference between 20 miles and a fraction less than 20 miles was the proximate cause of the collision." "By one hypothesis of this instruction they were authorized to find that negligence in the operation of the cab at 20 miles an hour as against a fraction less than 20 miles an hour was the proximate cause. Putting it conversely, they were authorized to find that had the cab been operated at a fraction less than 20 miles an hour the collision would not have occurred."

Reading the instruction it appears on its face to deal with the operation of the taxicab at 20 miles or more per hour. It, no doubt, was drawn to meet plaintiff's evidence that the taxicab was being driven at a rate of speed from 20 to 30 miles per hour. Of course, we must read the instruction in the light of the evidence. Defendant's evidence tends to show that the taxicab was being operated from 8 to 10 miles per hour. As before stated, plaintiff's evidence shows that it was being operated from 20 to 30 miles per hour. The jury, therefore, had nothing to do with any speed between 10 miles an hour and 20 miles an hour, and it, therefore, makes no difference what they might have thought in regard to a speed of a fraction less than 20 miles per hour in view of the fact that there was no evidence that the taxicab was being driven at such a speed. The jury could find any speed in excess or including 20 miles an hour the proximate cause of the injury. We are not called upon to say if some speed between 10 and 20 miles per hour had been shown and such speed had been submitted to the jury for their consideration, whether the instruction would have been erroneous in submitting a speed that could not have been the proximate cause of the injury, for the reason that no such speed is submitted to the

jury for their consideration in plaintiff's instruction No. 1. Their consideration was confined to a speed of 20 miles or more an hour. We have already stated there was evidence that the speed as submitted to the jury was the proximate cause of the injury.

While plaintiff's instruction No. 1 seems to be based on the excessive speed charge of negligence yet it contains language requiring the jury to find that the taxicab was operated on the wrong side of Broadway in addition to being operated at a negligent rate of speed. Plaintiff says that the fact that the taxicab was being operated upon the wrong side of the street made the speed the more negligent. However, we do not think that the fact that the instruction contains a reference to the taxicab being operated on the wrong side of the street makes it erroneous. There was evidence that it was so operated and evidence from which the jury could say that this was a proximate cause of the collision. If the taxicab had been operated upon the right side of the street, the driver could have swerved his car to the right and the Ford car, no doubt, could have passed in front of it. This case is, therefore, not like the case of Houck v. Railroad, 116 Mo. App. 559, 567. There the facts were peculiar. The matter of defendant's keeping machinery attractive to children in an unguarded state where children were likely to be inveigled into playing with it, was mentioned in an instruction directing a verdict upon another specification of negligence and the court held that the attractive nuisance theory was not in the case and an instruction offered by defendant seeking to withdraw that matter from the jury should have been given. In this case the matter of the driving of the taxicab on the wrong side of the street was a matter of negligence pleaded and proved and could have been properly submitted in a separate instruction.

In this connection defendant complains of the refusal of the court to give its instruction No. D-1, which told the jury that if they believed the taxicab was being

driven upon the wrong side of the street they could not find for plaintiff on account of such fact. This instruction was properly refused and the case of Houck v. Railroad, supra, where defendant sought to have the attractive nuisance theory in that case withdrawn from the consideration of the jury by an instruction offered by it, is not in point. In plaintiff's instruction No. 1 she assumed an unnecessary burden in having the jury find that the taxicab was being driven upon the wrong side of the street.

It is insisted that plaintiff's instruction No. 2 was erroneous for the reason that the word "imputed" was used without definition. We are not prepared to say that the word "imputed" as it is used in the instruction, in view of all the language used in it, is one that a layman would not understand. The instruction after using the word goes on to tell the jury what negligence could not be imputed to plaintiff. Webster's Dictionary defines the word imputed as follows—

"To set to the account of a person; charges or credit one with being the author or possessor of or responsible for; ascribe; attribute; with to: now more commonly in a bad sense; as to impute blame to a person.

2. Theol. To place to one's account; attribute on account of another; reckon vicariously."

In Ziegler v. United Rys. Co., supra, l. c. 1017, the court used the word "attribute" as synonymous with "impute." We do not think that the jury by reason of this instruction could have been misled by the use of the word complained of.

Defendant complains of the refusal of its instructions Nos. 5, 6, 7 and 8 and the giving of such instructions by the court in a modified form. These instructions sought to have the jury find that the negligence, if any, of the driver of the Ford car was to be imputed to plaintiff and each to direct a verdict for defendant on that ground and, therefore, were properly refused. Instruction No. 5 submits the question as to whether the driver

of the Ford car was going at a speed in excess of 10 miles per hour; instruction No. 6 submits whether the driver of the car by the exercise of ordinary care could have stopped the car or turned or swerved the car aside and thus have avoided the collision; instruction No. 7 submits whether the driver of the Ford was negligent in not having anti-skid chains on his car, and instruction No. 8 told the jury that if the driver of the Ford car drove into the intersection while cars traveling north on Broadway were in said intersection, he was negligent and if plaintiff was injured by reason of such negligence their verdict should be for the defendant. All of these instructions were amended by the court by inserting at the end of each one the phrase "provided you find that defendant's driver was in the exercise of ordinary care at the time and under the circumstances in evidence."

It is insisted that the instructions as submitted broaden the issues and constitute a roving commission to the jury to find for plaintiff on any theory of negligence, whether pleaded or not; that the jury were not required to find that the negligence of defendant's driver was the proximate cause of the injury. These instructions as given do not purport to direct a verdict for plaintiff or to state under what circumstances plaintiff was entitled to recover. [Compare Howell v. Davis, 236 S. W. 889, 891.] They do not tell the jury that before they could find for the defendant it would be necessary for them to find that defendant's driver was in the exercise of ordinary care in every respect, but merely that before they could find for defendant on the facts submitted in the instructions they should find that defendant's driver was in the exercise of ordinary care generally. Defendant could have drawn proper instructions and had them submitted to the jury limiting their consideration to the issues and excluding matters not in issue in relation to which defendant was required to exercise ordinary care. Had defendant done so such instructions would not have been in conflict with those given by the court. These instruc-

tions do not purport to tell the jury in what circumstances or under what conditions defendant was required to exercise ordinary care and were equivalent to telling the jury that if they found that defendant's driver was in the exercise of ordinary care, they should find for the defendant. There was nothing harmful in the instructions given although it might have been better had they been refused without trying to amend them.

Complaint is made that the court permitted plaintiff to prove injuries not pleaded. The injuries pleaded in connection with the evidence objected to were as follows:

"Plaintiff was bruised, contused, sprained, jarred and injured in and on all parts of her body, head and limbs; her back, spine and spinal column were bruised, sprained and injured, and she received a severe concussion of the brain and spine; that plaintiff's shoulders and the muscles, ligaments, tendons and nerves thereof, were cut, bruised, sprained, lacerated, torn and injured, and the bones thereof fractured, broken, displaced and injured, and collar bone fractured; that she received severe internal injuries in that her genito-urinary organs were bruised, displaced and injured, causing a general dropping down and displacement of all of said organs and their contents; that she received a severe shock of her entire nervous system."

Plaintiff's physician was permitted to testify, over objection, that he examined her shortly before the trial and found the mucous membrane white and painful and the uterus hard. The physician in describing the mucous membrane was merely describing the appearance of plaintiff and was not attempting to testify to a condition or disease. In saying that the uterus was hard he was testifying as to a symptom or evidence of the displacement and dropping down of the uterus and not as to a condition or disease. The objection at the trial to the physician testifying as to plaintiff's nervous condition and that she complained of constant pain, that the effects of displacement is "pelvic pains, backache and in some

cases headaches back of her head," that the displacement was a constant annoyance to plaintiff, was not made upon the grounds now insisted upon. It is now stated that this evidence of the physician was improperly admitted because he was giving his conclusions instead of his opinion; that he did not testify what the effect "might or could be." There was no such objection at the time this evidence was given, therefore, it cannot be made at this time.

Upon the cross examination of defendant's witness, the taxicab driver, he was asked the following and the following occurred—

"Q. And you thought at that time that it was safe, that you could beat him across? A. Yes, sir, because I had the right of way.

Mr. Madden: I object to that statement about he thought he had the right of way because it is a conclusion and opinion of the witness.

The Court: Sustained.

To which acting and ruling of the court the defendant then and there duly excepted at the time and still excepts."

It is insisted that the ruling of the court in regard to this matter was erroneous; that the question called for what the witness "thought" and it was unfair for him to be permitted to answer the question only by yes or no without allowing him to make any explanation. The taxicab driver testified that he reached the intersection first; that he brought his car nearly to a stop at the intersection and then proceeded across on the right hand side of Broadway on the north bound or east car tracks at a speed not to exceed 8 miles an hour; that when he arrived upon the south car tracks on Southwest boulevard he saw the Ford car coming into the intersection at a rate of speed estimated by him at between 30 and 35 miles an hour; that he assumed that he had sufficient time to cross when he was at the intersection, but when he saw the Ford car coming on into the intersection

Jepson v. Shaw Transfer Co.

he realized that a collision was imminent and attempted to put on power to increase his speed and thus avoid the collision by getting out of the path of the Ford car, and at this time the Ford car began to skid and swerve slightly north and into the side of this car. The above question was asked in relation to what the witness did when he was on the car tracks, and speeded up in order to get out of the way of the Ford car.

We do not think that defendant was prejudiced by reason of the striking out of the latter part of the answer of its witness. The witness had already given his reason for speeding up, that he thought to pass ahead or in front of the Ford car that was coming at such a high rate of speed. At the time he put on speed, thinking that he could beat the Ford car across, the matter of who had the right of way was not material and could not have influenced the mind or action of the driver of the taxicab. The driver of the taxicab saw the Ford car coming at a tremendous rate of speed and that it was going to cross the path in which the taxicab was moving, so the driver of the taxicab speeded up his car in order to get from in front of the Ford car. What influence at that time the matter of the right of way had upon the driver of the taxicab is hard to see. Under such circumstances the statement by the witness that he had the right of way seemed to have been merely his conclusion and one that even if properly expressed under the circumstances had no bearing upon the situation. He was simply attempting to inject into the case the idea that he had the right of way at a point where that matter had no bearing.

Upon cross examination of the driver of the taxicab plaintiff brought out that his deposition had been given. He was asked if he had given certain testimony when it was taken. He admitted that he had made several answers but denied others. In rebuttal plaintiff put upon the stand the stenographer who took the deposition and by her testimony sought to impeach the witness. We

find that the stenographer testified to four answers given by the witness to which defendant objected at the trial; that two of these answers upon his cross examination were denied by the taxicab driver as having been made by him. They, therefore, were properly shown. The other two answers testified to by the stenographer were the same as those the taxicab driver admitted that he had given in his deposition and therefore they did not successfully impeach him. However, we are unable to see how defendant could have been prejudiced by reason of the fact that plaintiff sought to impeach the witness by these two answers but failed to do so.

Complaint is made that the court erred in refusing to sustain defendant's challenge of the juror Dawson. This juror upon his *voir dire* was asked if he remembered a controversy with Mr. Harman, one of defendant's officers. He testified he was engaged by Harman to do a little furnace work in a house occupied by a tenant of the latter; that he presented the bill to Harman for payment and that Harman said it was the tenant's bill; that it was a very small affair and the whole matter did not run over five or six dollars; that he had no feeling in regard to the matter and that it would not affect him "a particle" in deciding the case; that when Harman said it was the tenant's bill "I dropped it;" that he did not get angry about the matter and that he could try the case and base his verdict solely on the evidence and upon the law to be given him by the court in the instructions; that "it would not cut a bit of figure with me one way or the other, in fact, I have forgotten about the case." We think that the court did not abuse its discretion in refusing to sustain the challenge. [McManama v. Railroad, 175 Mo. App. 43; Tawney v. United Rys. Co., 262 Mo. 602; Richardson v. Kansas City Rys. Co., 231 S. W. 938; Theobald v. Transit Co., 191 Mo. 395.]

It is last contended that the verdict is excessive. The facts in this connection show that plaintiff was

thrown to the pavement and that the other woman occupant of the car, who was a large woman, fell on her. Plaintiff struck her head which, together with her left shoulder and back, was hurt and she suffered internal injuries. There was a large bruise on her head causing a large swelling and a black and blue spot that disappeared in time but at the trial, which was three years after the collision, she was suffering from headaches and dizziness. Her left collar bone was fractured. She was taken to a nearby house immediately after the accident and then to a hospital where she remained five days. When she arrived at the hospital she felt weak and dazed and had chills. When plaintiff tries to lift her arm or to get it up over her head there is a catch in the shoulder and it aches in the break and in the shoulder. This aching she feels all of the time but at certain times it is worse than at others. When she tries to lift anything or to wear a heavy coat the ache is worse. The limitation of the movement of the left arm is fifteen per cent and is permanent. Her back was bruised about the center thereof between the hips; her back has continued to pain her ever since the accident. She suffered a prolapsus of the uterus and her menstruation has been irregular since. She is unable to sleep well at night and suffers from nervousness. She feels weak and has not the strength she had before. She has lost flesh and her color is bad.

Dr. Berry examined her shortly before the trial and found her emaciated and nervous; that the mucous membrane was white and painful; that the uterus was hard and reflexed posterially; that the fallopian tubes were thickened and hard; that the ovaries were swollen and that the fungus of the uterus was tipped back on the rectum. This condition, with the exception of the anaemic condition and general impairment of health which could be improved, can be remedied by an operation. This operation would require an incision through the abdomen and would be what is called a major operation. It consists of breaking up the adhesions within the ab-

domen and the binding down of the uterus and fallopian tubes and bringing the fungus of the uterus up and what is called a ventrical fixation made and sewed up to the walls of the abdomen to hold the uterus in place. This is the usual operation and in about eighty-five per cent of the cases the operation is comparatively successful. Some doctors would remove the uterus and ovaries, which would result in unsexing the patient. In the usual operation the ligaments that support the uterus are shortened and the fungus of the uterus stitched to the walls of the abdomen. This is an unnatural fastening. Naturally the uterus folds easily within the pelvis. Dr. Foster, who was called to treat the plaintiff immediately after the injury, testified that after an operation of this kind if the patient becomes pregnant the dilation of the uterus during pregnancy is apt to loosen it from its adhesions.

Dr. Berry testified that plaintiff's nervous condition to a large extent is permanent. Dr. Foster testified that plaintiff suffered a first degree prolapsus of the womb; that the uterus was dropped down into the vaginal canal when he first saw it; that he packed the uterus, which gave only temporary relief; that pains in the back were usually present in uterus displacement; that the spells of dizziness could have come from the blow on the head such as the swelling indicated that she had received; that her nervous condition might result from an injury to the womb; that an operation was the only possible relief for plaintiff's condition of prolapsed uterus.

Plaintiff testified that she was the mother of five children and that the family consisted of her husband, her children, her sister and herself; that her husband was a farmer owning a large farm and occasionally had hired help that would take their meals at her house; that she and her sister had done all the work previous to her injury but that since then plaintiff had not been able to do very much work but that she always attempts to do what she can, but cannot do any sweeping or wash-

ing or anything that takes much strength; that if she was on her feet for any length of time it brought on pains and dizziness; that her sister had done the household work since plaintiff's injury. Before her injury plaintiff was a strong, healthy woman. Under this evidence we do not think that the verdict is of such size as to warrant us in interfering with it.

The judgment is affirmed. All concur.