RILEY N. REAVES, RESPONDENT, v. A. A. KRAMER ET AL., APPELLANTS.
—97 S. W. (2d) 136.

Kansas City Court of Appeals. April 6, 1936.

*Harry G. Kyle, Lee Davis* and *Hume & Raymond* for respondents.

*Charles M. Bush* and *Johnson, Garnett & Quinn* for appellants.

BLAND, J.—This is a suit for damages for personal injuries. Plaintiff recovered a verdict and judgment in the sum of $5000 and defendants have appealed.

Plaintiff, at the trial, claimed to be suffering from an occupational disease, of a pulmonary nature which he contracted as a result of breathing great quantities of .dust, carborundum, glue and small particles of steel generated by a portable grinding or polishing machine, which he operated for the defendants as one of their employees. He alleged a violation by defendants of section 13234, Revised Statutes 1929, requiring persons or corporations using any polishing wheel or machine of any character which generates dust, smoke or poisonous gases in its operation to provide the machine with a hood connected with a blower or suction fan of sufficient power to carry off the dust, smoke and gases and to prevent its inhalation by those employed about such wheel and also a violation of section 13254 providing that, in all processes of manufacture or labor which are productive of noxious or poisonous dusts, the employer shall furnish for his employee, and maintain in good condition, adequate and approved respirators.

It is insisted by the defendants that the court erred in refusing to give their instruction in the nature of a demurrer to the evidence.

This contention is based upon several grounds. First: There is no evidence that the fibrotic condition of plaintiff's lungs, which the evidence shows he suffered from at the time of the trial, was caused by the grinding and polishing which plaintiff did for the defendants; that any conclusion that it was so caused must rest on conjecture, speculation and surmise; that the evidence is wholly insufficient to establish negligence in failing to provide plaintiff with an adequate and approved respirator and that all of the evidence shows conclusively that it was impossible to equip a portable grinder, such as the one used by the plaintiff, with a hood connected with a blower or suction fan.

The parties are far apart in their construction of the testimony bearing upon these questions, which has resulted in the necessity of a careful study of a very voluminous record. However, a statement of all of the testimony contained in the record would unduly prolong an opinion that must, of necessity, be long in view of the circumstances. So we will content ourselves with considering that testimony, and all reasonable inferences that may be drawn therefrom, which is most favorable to the plaintiff, in view of the rule concerning the consideration by Appellate Courts of demurrers to the evidence. This rule includes the proposition that, in reviewing the testimony, these courts must recognize that it is within the province of the jury to believe all or any part of the testimony of any witness, whether that of plaintiff or defendant, and may accept or reject any part of it. [Gould v. C. B. & Q. R. Co., 315 Mo. 713.] Consequently, it is unnecessary to state the testimony even of all of plaintiff's witnesses, but only that which is most favorable to him.

The facts show that plaintiff was first employed in July 1921, by the defendants, who were engaged in the manufacturing business and operating under the name of Columbian Steel Tank Company, in Kansas City; that he was then 26 years of age; that he was hired as a maintenance man to keep the tools and equipment in proper condition; that he continued to work as a maintenance man for nine years prior to the month of April 1930, when he was assigned to the work of grinding in a metal tank; that at this time defendants undertook to build the first Allegheny stainless, rustless steel milk tank ever constructed anywhere; that the tank was elliptical in shape, measuring fifty-four inches one way and seventy-two inches the other, sixteen or seventeen feet long and was designed to be used on a semi-trailer automobile truck. Plaintiff had never before done any grinding inside of a tank of this kind. The tank was completely assembled except for the front bottom, which was not in place. The tank was composed of sheets of metal welded together and it was necessary to grind down the joints or the seams and to polish the tank over its whole inside.

Plaintiff went to work in the tank about the 12th day of April and worked therein until about the first of June, when the front bottom of

the tank was put in place. After this was attached the tank was closed up except for a twenty inch manhole at the top where the workmen entered and a two and a half inch hole at one end which was left for the insertion of a faucet. After the tank was closed up by the attachment of the front bottom, plaintiff continued to work therein seven or eight hours a day until the 3rd day of July. The whole time that he worked in the tank was estimated at ten weeks and three days. During this time plaintiff, in doing his work, used a light, portable, high speed, rotary grinder operated by compressed air. This grinder was about eighteen inches in length and was composed of a handle on the end of which was a hard rubber grinding wheel about six inches in diameter and about an inch thick. The wheel had a coating on its circumference of a carborundum particles which were glued to the wheel by animal hide glue. The wheel revolved with great speed, making about 5000 revolutions per minute. During the work dust, sand and particles of steel were created by the grinding process. Sometimes it was necessary to put in two or three grinding wheels within an hour, the wear on the surface of the wheel being so great. The grinding would generate such a great quantity of dust, sand and steel particles that a ''heavy dense fog'' was created in the tank. The only device for drawing the atmospheric impurities from the tank was a small hose which was looped down into the tank with an open end fastened about two feet from the top of the manhole. Air under pressure passed through this hose and from the end of the hose near the top of the tank it blew air from the tank out through the manhole. When welding was going on in the tank this created sufficient suction to take out the smoke from the welding but it did not remove the grit, dust or particles of steel except the very fine dust. There was no forced draft of any kind in the tank. The exhaust from the grinding wheel furnished sufficient fresh air to the operator but it did not furnish a draft or means for disposing of the dust, etc.

During the work the plaintiff was furnished with and wore goggles. Defendants also furnished two types of respirators. There is no contention that these respirators were not of a type in general use in the industry, but plaintiff makes complaint of the filtering devises used in connection with them. One type of respirator was designed to be used with a wet sponge filter, but it was comparatively hot in the tank and no water was furnished therein for keeping the sponge moist and by reason of the apertures in the sponge, when it dried out, it did not furnish as efficient a respirator as the one using the rice paper filters furnished by the defendants. So plaintiff soon discarded the sponge filter and used the rice paper filters. The latter filters were made of thin paper about 1/32 of an inch in thickness with one side glazed and the other linty. Plaintiff could not use over two rice paper

filters at a time, although they were very light in weight, as more than that number made it too difficult to breath. When the wheel was in operation its great velocity made it hard to hold and the operator had to "wrestle" with it. Most of the grinding was done with the operator in a stooped position. The steel particles, grit, dust and carborundum came through the rice filters and when plaintiff would take off his respirator he would find it full of grit and dust and material of this nature would come through the respirator and become "caked and plastered over" his mouth. It would get into his teeth, throat and lungs.

Plaintiff advanced the theory at the trial that the steel particles acted as an abrasive puncturing the rice filters. At any rate he was required to change them "every day, most of the time twice a day." Plaintiff was required to have his face within sixteen or eighteen inches of the wheel while operating the machine and during a part of the time the wheel was held in such a position as to throw steel, dust, sand and carborundum directly into his face. So much dust, etc., was generated that it collected in the bottom of the tank. Plaintiff did his work with the aid of a seventy candle power electric light.

Plaintiff's witness, Harrison, a former State Industrial Inspector, testified that the rice paper filter was not an adequate filter for this type of work. He further testified that there was available in Kansas City, at the time plaintiff was using the grinder, a felt filter which was 1/8 or 1/16 of an inch thick and that the felt filter "is much stronger, and particles coming off the grinder would not go through a filter like that like it would thin stuff."

The undisputed evidence shows that the grinder in question was not equipped with a hood, blower or suction fan. Plaintiff's witness, Harrison, testified that a stationary grinding machine is required to have a hood connected with a suction fan but stated that "you couldn't have a suction fan on a portable grinder." This evidence of the witness, Harrison, is undisputed.

After plaintiff had worked at the grinding for five or six weeks he began to feel "hazy and sick" and "heavy in the chest." He also noticed after he stopped working in the tank that he had "shortness of breath, soreness through the top of the chest, clear through and weakness" that he had not noticed before; that he could not stand fumes as he formerly did and could not climb up and down stairs as fast "on account of my breath, it gets me down, I am short of breath;" that he had lost about eight or ten pounds; that he had always before done hard heavy manual labor without trouble.

The evidence, however, shows that plaintiff had not been in perfect health over a period of at least nine years prior to his claimed injury. He was discharged from the army on January 30, 1919, and soon thereafter he contracted the mumps and was treated for them by Dr. Hashinger. He was treated by Dr. Crites from February 7,

1923, to March 16, 1924. On June 26th, Dr. Crites removed plaintiff's tonsils, which were badly infected. He was treated by Dr. Grimes from November 28, 1924, to August 19, 1925. He was treated by Dr. McClure from January 12, 1927, to August 20 of that year. These treatments were for various ailments, some of which the evidence shows, were imaginary. In this connection Dr. Grimes, testifying for the defendants, stated: "He is a nice fellow. He paid his bills and he wanted lots of treatments. We call those cases Neurosthenics."

As to his condition of health prior to the time he worked in the tank, plaintiff testified that in the forepart of 1919 he had a sore and inflamed throat, his chest "began to swell up" and mumps developed in February or March of that year and he was treated therefor "three or four times" by Dr. Hashinger and thought that he entirely recovered therefrom within a short time; that prior to the time of his working in the tank he was never seriously sick; that "I don't remember no sickness I ever had that I was in bed over three or four days;" that while working for the defendants he was off from work on three or four different occasions for periods of four or five days each; that he was off for three or four days when his tonsils were removed in 1923; that "I had about a week off in 1924 with colds;" that when he had to go to see the doctor he would do so during the noon hour and stay a little over the hour. He testified that prior to the removal of his tonsils he would have trouble with his throat "now and then when I would take a bad cold in the winter time," that Dr. Grimes treated him for "general debility and soreness in the throat;" that Dr. McClure treated him for "indigestion as much as anything else;" that before going to work in the tank he had suffered from nervousness a time or two, "not enough to hamper me in any way;" that he had never had any lung trouble of this character prior to the time he went to work in the tank; that he had never had any trouble keeping up his end of the heavy work in defendants' plant prior to working in the tank; that every time he took a serious cold prior to the time his tonsils were taken out he would suffer from sore throat; that he had a great many serious colds during the winter time; that Dr. McClure treated him for indigestion except at one time the doctor treated him for a sore throat "when I got a cold from working in a hot tank;" that in February, 1923, he was "run down," "I was nervous, over worked condition, tired" although he was working "mighty hard in them days;" that prior to 1930 his chest was "pretty good, I guess" as "I stood everything on earth around there" (where he worked); that from 1923 to 1927 he was bothered with indigestion; that he was tired, thin, slender and emaciated but able to do heavy work; that this was his general physical condition since 1919; that from 1919 to 1929 "now and then in the winter time" he had colds, sore throat and the la grippe; that he would not always go to the doctors for cold and sore throat but "sometimes." He denied

that he had ever had bronchitis prior to working in the tank in question but said that he had "cold down in the windpipe and sore under the jaw them years;" that he had cold, soreness and irritation in the chest but Dr. Crites soon relieved that; that Dr. Crites gave him diathermic treatments; that Dr. Grimes treated him for general debility and soreness in the throat and that that doctor's osteopathic treatments did him no good in the opinion of the witness; that as to his sore throat "it would get sore at times, flare up. Q. It hurt in your chest? A. That soreness;" that he was troubled with indigestion now and then for five or six years prior to 1930. "Q. How would it effect you when you had the flu? Would you cough and spit up? A. A little bit. I never was bothered seriously with bad coughs. Q. But you had drippings in your nose and you would blow your nose and spit out your mouth? A. At times. Q. That happened clear down from 1919 to 1929, didn't it? A. At times. Q. Yes. That would get in your throat and you would cough it up and spit it out? A. Once in awhile. I never was very bad about coughs;" that from the time his tonsils were taken out until September 1928, "I lost no time except now and then when I would be off with a cold."

There was other testimony that plaintiff "looked like a healthy man" in 1928 and did not appear sick until after he worked in the tank. Plaintiff left the employ of the defendants in September 1931. One of the witnesses testified that a little before he was discharged by defendants plaintiff lost weight and seemed to be real nervous. There was ample testimony from which the jury could find that plaintiff's condition of health was much worse after his experience in working in the tank than it was before. Several medical witnesses were introduced on behalf of plaintiff. One of plaintiff's doctors testified that plaintiff was suffering from secondary anaemia at the time of the trial. Plaintiff denied that he was so afflicted before working in the tank.

Defendants' theory is that the fibrotic condition of plaintiff's lungs was caused by chronic infection in his upper respiratory organs resulting from mucous and germ laden material dropping into his lungs. It is plaintiff's theory, of course, that it was caused by irritation created by his breathing of the dust, etc., generated by the grinding machine.

Dr. DeWeese, testifying for the plaintiff, stated, that he took an X-ray picture of the plaintiff's lungs on January 23, 1934, and found that he was suffering from fibrosis of the lungs. There was evidence that at least half of the area of plaintiff's lungs was so affected. The picture did not show any foreign substance in the lungs, such as metal, but nature removes such substances when they do get into the lungs and the evidences of them remain in the form of scar tissue or fibrosis. Dr. De Weese testified that the principal causes of fibrosis are irritation from chronic infections, irritation from foreign elements

breathed into the lungs and "a certain percent in fibrosis occurs as we grow older;" that fibrosis is scar tissue formed as a result of irritation.

Dr. DeWeese stated that he could not tell from the X-ray picture what caused plaintiff's fibrosis. He further testified that there are three stages of silicosis; that silicosis is a disease to the lungs caused by irritation as a result of exposure to an unusual amount of silicon over a long period of time, a much longer period of time than plaintiff was exposed to the dust, etc. in question. However, he stated that this referred to a "full blown" silicosis. He further testified that he did not interpret plaintiff's condition as silicosis but he could not entirely exclude it. At any rate he was positive that plaintiff was not suffering from a full blown silicosis or the one which requires such a long period of time to develop; that whether a man's lungs could be injured by breathing dust into them for a period of thirty to sixty days would depend upon the intensity of the irritation set up.

It is admitted that fibrosis of the lungs can be caused by infected drippings from the upper respiratory tract. Plaintiff's evidence shows, however, that this would require the drippings to continue over a long period of time. Dr. DeWeese further testified that the X-ray photograph disclosed that plaintiff had never suffered from sinus trouble. However, he testified that it did not follow that because he found nothing wrong with plaintiff's sinuses the latter had not suffered at a previous time from infection in the tonsils, trachea and other upper respiratory organs. There was other testimony that plaintiff, shortly before the trial, was not afflicted with any trouble with his upper respiratory organs; that his tonsils had been entirely and successfully removed and that he had had no after effects from the operation. Defendants contend that the fact that he had no infection shortly before the trial does not prove that he had none during the years prior to his working in the tank. However, there was medical testimony tending to show that, in order for infection to get into the lungs from colds and other ailments affecting the upper respiratory organs, the colds or ailments would have to be of such long standing and intensity as to leave scar tissue or evidence present and that there was no scar tissue in plaintiff's upper respiratory organs, except where plaintiff's tonsils had been removed.

Dr. Raab testified that if one's tonsils were diseased over a long period of time a "certain amount of fibrosis could get into the lungs." However, in this case, as before stated, the evidence shows that the removal of plaintiff's tonsils was successful and the throat healed up in due course. Plaintiff's tonsils were removed in 1923. No great stress is made by defendants on the claim that plaintiff suffered from fibrosis of the lungs in 1923. At any rate the jury could find that there was none then without speculating on the matter.

Defendants correctly state that no medical witness testified that plaintiff's lung condition resulted from his work in the tank but are in error, we think, in saying that no such witness gave it as his opinion that it might have been caused by such work. This, we think, was the testimony substantially of plaintiff's witness, Dr. Buckingham. It is true that in the hypothetical question propounded to Dr. Buckingham, it was assumed that plaintiff worked for two or three years near "the sand room where they were sanding and that he inhaled more or less sand in the tool room." The evidence relating to the inhalation of that sand was that for two or three years prior to his going to work in the tank plaintiff worked in and had charge of the tool room which adjoined a sanding room where were located stationary grinding machines which generated much dust and that this dust came into the tool room in such quantities that plaintiff had to sweep it up "quite often." In fact, he breathed more or less dust from the sanding room during the whole time that he worked for the defendants. It fairly appears that no great importance was given to the sanding room dust by either side at the trial. It is a well known fact that persons can breathe more or less dust without harmful results. In fact, the medical testimony shows that nature has equipped us with more or less elaborate defensive mechanisms to ward off from the lungs sand and other particles floating in the air which we breathe in ordinary quantities. But here we have a question of breathing great quantities of dust, etc. while plaintiff was confined in a small enclosure. However, in relation to the sanding room the hypothetical question propounded to Dr. Buckingham did not contain much information concerning the quantity of dust plaintiff inhaled from that room (it was referred to merely as "more or less dust") and it could have been given little weight by the doctor as the evidence shows that lung trouble develops from inhaling dust only in large quantities. The effect of including the sanding room dust in the question was wholly neutralized by the additional inclusion in the question of the following, at the suggestion of the defendants: That prior to working in the tank plaintiff "had bronchitis and he had inflammation of the throat and he had his tonsils taken out. Assume he was in a general run-down condition from lack of nourishment before this happened. Assume that *he wasn't exposed to a large continuous volume of sand for a long time but he was only in that tank thirty days with this respirator on*. Now, with those assumptions. The Court: (To the reporter) Read the last part of the question now. The Reporter: (Reading) 'Would you say, doctor, that the steel and the sand under those conditions could have caused the effect that you find in that X-ray picture?' " The answer of the doctor was, "they might have." The doctor testified that he had never heard of a case of fibrosis caused by the breathing of steel, sand and carborundum into the lungs for a period of as little as three months in sufficiently

large quantities to cause fibrosis. However, when asked if it was possible to develop fibrosis in that length of time he answered, that it would depend upon the amount of dust present.

Dr. Raab, who testified for the plaintiff stated that he examined plaintiff before the trial and found no infection of any kind in his throat or his upper respiratory organs; that he found that his tonsils had been removed and that there was no tonsillar tissue and no infection in his throat; that he concluded that the fibrosis of the lungs was caused by some mechanical (not infected) substance having been breathed into the lungs; that "I can't find enough evidence of infection in his throat to cause this fibrosis so in my mind the mechanical side would be the only one that I could discover." He further testified that carborundum has in it oxide of silicate, which is a toxic poison.

The evidence introduced on behalf of the defendants showed that plaintiff was treated by the doctors mentioned, *supra* (not, of course, the experts) 249 times prior to the time he worked in the tank; that these treatments were for colds, tonsilitis, sore throat, etc.

Defendants insist that the fibrotic condition of plaintiff's lungs was not shown to have been caused by his alleged exposure while grinding in the tank, but on the other hand, it was shown that it was caused by infection getting into his lungs from his upper respiratory organs and, to say the least, it is impossible to tell which caused his fibrotic condition and the verdict rests upon conjecture, speculation and surmise.

It is true that the expert witnesses on behalf of plaintiff testified that, if plaintiff was treated for colds, etc. 249 times over the period in question, presumptively he was suffering from infection in his upper respiratory organs of a nature that might result in fibrosis of the lungs. Of course, these doctors could not and did not assume to know whether it was necessary for plaintiff to be treated that number of times. As before stated, there was evidence that plaintiff suffered from neurasthenia; that he not only exaggerated the ailments he had but that he imagined he had some that did not exist. The evidence of plaintiff, himself, shows that he was not treated that many times for colds, although it does show that he suffered from colds during the time in question. The jury was entitled to believe plaintiff's testimony as to the extent of his ailments prior to the time he worked in the tank. This testimony shows that, while he suffered from colds, sore throat, etc. this occurred more often prior to the time his tonsils were removed than thereafter and that he suffered from colds only at times and at no time did they interfere materially with his work; that he was off from work on very few occasions, comparatively.

It may be admitted that he may have suffered from colds and sore throat but, under the medical testimony, in order for his lungs to become fibrotic as a result of the dropping of infectious material from

his upper respiratory organs into his lungs, his colds and sore throat must have been intense and existed over a long period of time. Conceding that plaintiff's health was not perfect and that he did suffer from colds and sore throat, etc., it was within the province of the jury to determine whether the fibrotic condition of his lungs was the result of these ailments, especially in view of the testimony of Dr. Raab that, in order for the infection from his upper respiratory organs to have caused his lung condition, it would have had to be so intense as to have left scar tissue, which was absent (except as to the tonsils), and in view of plaintiff's testimony that he had no lung trouble of this character prior to working in the tank.

As before stated, it is true that none of the doctors stated that plaintiff's lung condition was caused by the dust, etc., created while he was working in the tank. However, Dr. Buckingham testified, in effect, that it might have been caused by so working even for a shorter period of time than the evidence shows he was engaged in the grinding inside of the tank. There was other evidence taken with the mdical testimony, from which the jury could find that his lung condition was caused by his working in the tank.

The evidence shows that the work that plaintiff was doing in the tank was of a strenuous nature. Not only this, but a witness on the part of the defendants, testified that it was necessary to get out of the tank and rest after grinding for a period of fifteen to twenty-five minutes; that the whole working time was thus taken up about half and half working and resting. The evidence shows that the tank was almost enclosed with relatively small openings and that there was no forced draft and very little opportunity for dust, etc., to escape; that the grinding created dust of a density described as a "heavy, dense fog."

It is well known that workmen doing heavy work breathe hard and deep and the jury could well conclude, in view of the failure of the rice filters to keep the dust out of plaintiff's mouth, throat and lungs and allowing his mouth to be "plastered and caked over," that he breathed a great amount of dust, etc., during the ten weeks and three days that he worked in the tank.

The evidence shows that after he worked a short while in the tank he experienced symptoms that indicated that his lungs were being affected. There was also evidence that there was a decline in his health after he worked in the tank compared with its state prior to his commencing work therein. In addition to this was the medical testimony that plaintiff's lung condition might have been caused by his work in the tank and his working under the circumstances, even for such a short period of time, might cause fibrosis depending upon the density of the dust, etc. This question, under all of the evidence, was one for the jury. [Scanlon v. Kansas City, 81 S. W. (2d) 939.]

We have not overlooked the point raised by the defendants that where the evidence shows that the injury may have resulted from one or two causes, for one of which, but not the other, defendants would be liable, plaintiff must show with reasonable certainty that the cause for which defendants would be liable was one of the proximate causes of the injury. In other words that it must be shown with reasonable certainty that the cause of the injury was due to the wrongful act of the defendants and this must not be left to speculation. However, the rule goes further than this and is to the effect that plaintiff's evidence need not exclude the possibility of accident or a cause for which defendant is not liable and it is sufficient to make a submissible case that there be substantial evidence that the injury resulted from the cause for which defendant is liable. [Am. Vet. Labs. v. Glidden, 59 S. W. (2d) 53, 60; Cech v. Mallinckrodt, 20 S. W. (2d) 509.] We think the evidence in this case was such as to entitle plaintiff to go to the jury.

It is insisted that the demurrer to the evidence should have been sustained because the evidence wholly fails to establish negligence on the part of the defendants in failing to provide plaintiff with an adequate and approved respirator, as provided by section 13234.

It is true that there was no claim by plaintiff that the respirators, outside of the filters, were inadequate in any respect, the only complaint being as to the efficiency of the rice filters furnished to be used in the respirators. It is also true that defendants' evidence shows that the type of filters furnished by them were in general use by manufacturers and there is no evidence on the part of the plaintiff to the contrary. Plaintiff's evidence goes no further than to show that the felt filter was a better filter than the rice filter and that it was adequate and available in Kansas City at the time in question. Defendants contend that they were not required to furnish the best, the newest and the most modern type of filter and that the requirement under the law is merely that the filters furnished be of a type in general use by others in like or similar businesses. This contention is very well when applied to common law negligence cases, such as Coin v. Talge Lounge Co., 222 Mo. 488, cited by defendant, but here we have a statute to deal with. The statute provides that every employer in this State, etc., shall furnish to the employee an adequate and approved respirator where any machine of the character in question is being used. The statute is mandatory and makes no exception. If it were necessary to furnish the newest and most modern filters in order to comply with the statute then defendants were under the duty to furnish them and the failure to do so was negligence *per se*. [Wagner Elec. Corp. v. Snowden, 38 Fed. (2d) 599, 604.] It is true that an approved respirator, within the meaning of the statute, is one that the public has approved and adopted or recognized as a suitable means to prevent the injury which the lawmakers hoped to avoid

(Boll v. Condie-Bray Paint & Glass Co., 11 S. W. (2d) 48, 52);
but the statute provides that the respirator is not only to be approved
but adequate and even though the ones in question might have been
approved, if inadequate, they did not comply with the statute. Plain-
tiff's testimony tends to show that the respirators that were furnished
equipped with a sponge filter and rice paper filters were not adequate;
that he tried the sponge type filter and found it even less effective
than the rice paper filters and that neither were adequate for the
purpose of preventing the breathing of large quantities of dust, etc.,
by the operator of the machine. The demurrer to the evidence was
properly overruled.

Complaint is made of the giving of plaintiff's instruction No. 1
which starts out by telling the jury the law in reference to furnishing
and maintaining "adequate and approved respirators," etc. It then
submits facts covering the entire case and directing a verdict, but
the only negligence submitted was the failure of the defendants to
furnish an adequate respirator. Nothing is submitted in reference
to an approved respirator.

It is claimed by the defendants that the instruction is erroneous in
not defining the word "adequate" or the word "approved." Whether
the word approved as used in the statute is a technical term and ordi-
narily needs defining, is not an issue for the reason that the question as
to whether the respirators furnished were approved was not submitted
but merely whether they were adequate. The word "adequate," in
this connection, is used in its ordinary and popular sense and needed
no defining. [Schrowang v. Von Hollman Press, 75 S. W. (2d) 649,
653; Jepson v. Shaw Transfer Co., 243 S. W. 370.]

We have examined the case of Plank v. R. J. Brown Pet. Co.,
61 S. W. (2d) 328, cited by the defendants and find it not in point.
In that case, l. c. 332, it was suggested that, at the next trial, plain-
tiff's instruction, which used the words of the statute (not the one
involved in the case at bar) should be made "more specific and concise
and be restricted and applied *to the facts of the case,* thereby obviating
the criticism of it in its present form as being too abstract and gen-
eral" etc. (Italics ours.) From what we have said of the instruction
in the case at bar it is not subject to the criticism made of the in-
struction in the Plank case.

It is claimed that the court erred in giving plaintiff's instruction
No. 2, which submits to the jury the violation of section 13234, or
the failure of the defendants to equip the grinder wheel in question
with a hood, connected with a blower or suction fan with sufficient
power to carry off the dust, etc. In this connection it is pointed out
that plaintiff's own testimony shows that it was impossible to so equip
the wheel in question. It is claimed that the statute is necessarily
subject to the construction that it is to be applied only where it is
possible to apply it. It is submitted that the statute does not qualify

the requirement by the words "if possible," but it is said that, notwithstanding this, the courts do not require the doing of the impossible and the statute must be given a reasonable construction. In reply to this point plaintiff directs out attention to the fact that this statute, like section 13542, by its terms, is mandatory and on its face permits of no exception. Plaintiff says that the statute, being plain and unambiguous, is not subject to construction, citing a number of cases holding that when the language of the statute is plain and unambiguous, the courts are not authorized to construe it. [59 C. J., p. 953; State ex rel. v. Dircks, 211 Mo. 568; State ex rel. v. Lee, 303 Mo. 641; State ex rel. v. K. C., 276 S. W. 389; State ex rel. v. Cook, 178 Mo. 189; 25 R. C. L. 972.]

We are not called upon to decide what, in our own opinion, is the proper construction to be given to this statute for the reason that the Supreme Court, whose decisions we are required to follow, has construed it in the case of Boll v. Condie-Bray Paint & Glass Co., supra. It is there held that the fact that it may not be possible, in a given case, to equip such a machine with a hood, connected with a blower or suction fan, etc., is no defense. It might be said that, while the evidence in the case at bar shows that it was impossible to comply with the statute in question in this instance, it was not impossible to do so in an absolute sense, but it was impossible in the sense that the work could not have been done in the particular manner that it was being performed, if at all, had the statute been complied with. The statute did not require defendants to do something that it was impossible for them to do regardless of the circumstances. The statute, in substance, prohibits the use of the machine if it cannot be equipped with a hood, etc.

It is claimed by the defendants that the Boll case goes no further than to hold that the employee is not under a duty to prove the practicability of the equipment. An examination of the Boll case shows that the court said nothing about the question of the burden of proof but states, in effect, that the possibility of complying with the statute is not an issuable fact in these kind of cases. This is made apparent on pages 53 and 54 of the opinion, where the court said:

"And section 6819, (now sec. 13254) providing for the furnishing of respirators, says that 'adequate and approved respirators shall be furnished and maintained by the employer.' No provision is there made for a discretion on the part of the employer in the manner of complying with the statute. And section 6827 uses the word 'shall' when speaking of the duty of the employer to provide a hood or covering for hoppers or chutes for the purpose of drawing away from the employee noxious, poisonous, or injurious dusts.

"We cannot agree with counsel that it was the duty of appellant to offer evidence that such devices, methods, or means were practical,

feasible, or possible; nor that respondent had the same hand or could have the same by reasonable expense.

"As sections 6817, 6819, 6825 and 6827, R. S. 1929, are imperative in their requirements, and as no exceptions are therein made, it was unnecessary for appellant to do more than to introduce evidence that respondent had violated these statutes, resulting in· the injuries complained of by him."

We have examined the cases cited by defendant and find them not in point.

From what we have said there was no error on the part of the court in refusing to permit defendants to show that the use of a hood equipped with a blower or suction fan on the machine in question was impractical and impossible, and permitting plaintiff to show that the felt filter was available without showing that such a filter was in general use at the time plaintiff was engaged in the work in the tank.

It is insisted that the court erred in permitting plaintiff to read parts of an article appearing in a medical journal in connection with the cross-examination of one of defendants' medical witnesses. Most of the comment in the article unfavorable to defendants was stricken out on the court's own motion. Defendants now claim that the article was so prejudicial in its nature that the striking out by the court could not have cured the error. However, the defendants, when the court struck out the testimony, did not request that the court do anything further than the court actually did· and, if they thought that the prejudicial character of the article could not be cured by striking it out, they should have ·moved that the jury be discharged. Failing to do so, they are not now in a position to complain. [Osby v. Tarlton, 85 S. W. (2d) 27; Leahy v. Lemp, 214 S. W. 228, 233.]

It is claimed that the court erred in overruling defendants' supplemental motion for a new trial and in refusing. to consider evidence of the jurors as to what occurred among them in the jury room showing that the verdict (although no outsider communicated with them in the jury room) was the result of outside and improper influences or information obtained by them outside of the jury room. The rulings of the court in connection with this matter were correct. The supplemental motion for a new trial was not only not filed within four days after the verdict was returned but it was not even filed during the same term, and the testimony of the jurors tended to impeach their own verdict. [State ex rel. v. Ellison, 256 Mo. 644; Lamport v. Gen. Acci., etc., 197 S. W. 95; Steffen v. Southwestern Bell Tel. Co., 56 S. W. (2d) 47; Evans v. Klusmeyer, 301 Mo. 352.]

It is lastly insisted that the verdict of the jury was so overwhelmingly against the weight of the evidence that this court should disagree with their conclusion and that of the trial court and reverse the judgment. In this connection cases are cited where the Appellate

Court has felt such a sense of outrage with the result reached by the jury that it saw fit to make exceptions to the almost universal rule that the weight of the evidence is conclusively for the jury and the trial court. However, after a careful examination of the record in this case, we are of the opinion that nothing more is involved than the mere weight of the evidence and this point will be ruled against defendants. [Bachman v. R. R., 310 Mo. 48; Parrent v. Mobile & O. R. Co., 70 S. W. (2d) 1068; Hardin v. Illinois Central R. Co., 70 S. W. (2d) 1075.]

The judgment is affirmed. All concur.

## ON MOTION FOR REHEARING.

BLAND, J.—We have carefully examined the motion for a rehearing and find no merit therein.

It is claimed that we have failed to state material evidence of medical witnesses for plaintiff, which is uncontradicted, showing that plaintiff cannot recover. This criticism of the opinion is without any foundation to support it. We feel the opinion is too long now, and that the point does not justify adding further to it.

A constitutional question is sought to be raised for the first time in the motion for a rehearing in that it is claimed that our construction of the statutes, mentioned in the opinion, renders them void as violative of the 14th Amendment of the Constitution of the United States. A constitutional question cannot be raised in such a manner. [Woodling v. Westport Hotel Co., 55 S. W. (2d) 477.]

The motion for a rehearing is overruled.